United States v. Robert Brumfield, Jeremy Estivis. We will proceed with the argument. Members of the panel, may it please the Court, my name is Aaron Novod, Counsel for the Appellant, Robert Brumfield III. I would like to reserve two minutes of my time for rebuttal. Mr. Brumfield's sole conviction in this case rests upon the word of informant Jamel Hurst, whose credibility would have been destroyed if the prosecution had disclosed evidence in its possession. In exchange for Hurst's favorable testimony, he was promised protection from future prosecution, and the government repeatedly followed through on that promise, all without informing Mr. Brumfield or his counsel. The prejudice caused by this suppression is clear given the paucity of the evidence and that Mr. Brumfield was acquitted of the substantive counts. Leaving Hurst's testimony to stand alone, we ask that Mr. Brumfield's conviction be vacated. I would like to focus my argument today on Mr. Brumfield's Brady claim. The district court did find that there was a significant difference between the impeachment evidence that Jamel Hurst faced at trial and the impeachment evidence that was put forward by the defense in its motion for new trial. At trial, Jamel Hurst testified about his hopes. He hoped that he would receive money from Crimestoppers. He hoped that he was, at the time he was facing charges in Baton Rouge, and he hoped that the prosecution in this case would make a call to the judge or the prosecutor there and tell him about his cooperation. But in reality, Jamel Hurst knew that if he testified favorably for the prosecution, he would reap the benefits. He knew that before he testified to the grand jury, AUSA McMahon and FBI agent Reyes had told him that if he testified in accordance with their wishes, he would receive a get-out-of-jail-free card for anything up to a murder charge. And he knew that the protection was critical to his freedom, though a different story came out at trial because of the suppression of evidence. A mid-trial disclosure showed that when Jamel Hurst was opened up as an FBI source, there was an aggravated burglary warrant out of Orleans Parish. Now, AUSA McMahon, the NOPD, and the Orleans Parish Attorney's Office were all told about this, and there was an agreement that he would not be extradited from Texas. There was an effort by Jamel Hurst and by the prosecution to downplay the importance of this evidence at trial when Jamel Hurst testified that he did not need any protection because the reason why that aggravated burglary charge was not pursued was because it was based on a mistaken identity. I apologize, yes, a mistaken identity. Yes, Judge Elrod. What do we do with the other evidence placing him at the scene? It seems to be in there some cell record, other evidence. Is it your position that that's not enough? What is the standard by which we determine that? Yes, Your Honor. I think that really goes to the prejudice prong of the analysis, and I think that, again, what's very important here is that the jury acquitted Mr. Brumfield of the substantive counts. To support those counts, the prosecution, like you said, argued that Mr. Brumfield was a getaway driver, but the jury found that the evidence did not prove those allegations beyond a reasonable doubt when he was acquitted of those charges, and while we do not know the exact reasons why they reached that conclusion, there was a heap of evidence going against the prosecution's allegations. Right, but are you saying that we should completely ignore that evidence because on other counts the jury may have not found it credible, but we don't know because we're not in the mind of the jury? Don't we have to take into account that other evidence in deciding whether or not there is reversible error here? I believe here, Your Honor, it should be minimized to a great extent based upon the jury's verdict because it does show that in terms of a reasonable probability of a different verdict, the only evidence showing that Mr. Brumfield participated in this conspiracy outside that evidence about him being a getaway driver came from Jamel Hearst, and again, the jury had already found that the prosecution did not prove beyond a reasonable doubt that the prosecution proved those counts, and so I believe that there's a reasonable probability that they also did not find that those allegations were proved with regards to the conspiracy conviction which is Mr. Brumfield's only conviction that stands. Okay, so what case do you have that says we should discount the other evidence other than Hearst's testimony that supports the verdict? Your Honor, I did try to do a search for evidence for case law on that. I did not find case law really going either way on that. What happened to the other people, the six people, right? In terms of all the co-defendants? Yes. Well, obviously Jeremy S. Steves He's here. was tried along with Mr. Brumfield. Curtis Johnson went to trial and was convicted. I believe he has arguments here next month. Ofamaya pled guilty, and I don't remember off the top of my head exactly what the results were for the other co-defendants, so perhaps the other counsel. That's not a problem. Do you know the sentences? I do not recall the sentences offhand, I apologize. The death penalty, or you don't know? No, no one received the death penalty. I do not believe that any cases actually were authorized and went to trial with a possible capital sentence. So are you dealing with the error in the sentencing, the alleged error in the sentencing? Did you want to address that or not? I actually have a few more points I would like to make on the Brady prong, and so if I could make those. I think important here is that the prosecution recognized the importance of the statement that Robert Brumfield allegedly made to Jamel Hurst in which he said that he had been participating in surveillance of this armored truck. FBI agent Elmer confirmed that the only evidence that the prosecution, the government, had that Mr. Brumfield participated in surveillance or planning came from that statement to Jamel Hurst, and the prosecution capitalized on that statement six times in closing. And I think in La Cause, in Tau San, I think there are a host of cases showing that such evidence where the prosecution recognizes the importance of that testimony and capitalizes on it during closing, that's extremely important with regards to the prejudice analysis, which I think really is the linchpin of this case. And I see my time is running out, so unless there are any other questions, I'll reserve for rebuttal. Okay, thank you. Thank you. Mr. Sprinkle? Good morning, Your Honors. May it please the Court. Richard Sprinkle here on behalf of Appellant Jeremy Estes. I will also be reserving two minutes for rebuttal if allowed. Thank you, Your Honors. Considering a proper Brady analysis under Ciles v. Whitley, Mr. Estes was deprived of his Fifth Amendment right to a fair trial when the government suppressed certain jailhouse phone calls made by its star cooperating witness, Jamel Hurst. Had those calls been provided to the defense, that would have given additional impeachment evidence against Mr. Hurst as well as Agent Reyes regarding deals made between the government and Mr. Hurst regarding certain benefits he received, particularly regarding the case in East Baton Rouge for which he was in pre-trial detention at the time of the trial. It would also allow defense the opportunity to subpoena and examine Mr. Hurst's mother, who was the other party to these phone calls from jail. Ultimately, the district court decided these calls were not material when it did its analysis and said they weren't material to guilt in the appellant's case because the district court failed to properly analyze materiality under Bagley and Ciles. Now, that flawed analysis is what brought us here today, Your Honor. We know that the Brady rule, going back to 1963, says that if the government suppresses evidence favorable to the defense, material to guilt or punishment, then due process requires a new trial. Now, Brady set the rule, but it didn't fully explain what materiality really meant. So 22 years later, Bagley comes along. And Bagley, the court said, evidences material that if, had that evidence been disclosed to the defense, there would be a reasonable probability that the result of the proceeding would be different. A reasonable probability being one sufficient to undermine confidence in the outcome. Confidence in the outcome is very critical here. But that was still not clear enough. So the courts had another crack at it 10 years later when Ciles v. Whitley came up from this very circuit. Now, in Ciles v. Whitley, Justice Souter discusses Bagley's first touchstone of materiality being that reasonable probability again. And Justice Souter was critical. He said it's not just a useless adjective. It means something. The question is not whether the defendant would more likely than not have been acquitted. The question is whether or not he received a fair trial in the absence of that evidence. Now, a fair trial in that case, in Ciles, means one, a trial resulting in a verdict worthy of confidence. Again, confidence. This is important. Because when there's a reasonable probability of a different result, I'm sorry, a reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. In this trial, Mr. Steeves was primarily convicted on the testimony of two witnesses, Cedric Wade and Jamal Hurst. Wade testified that he saw Mr. Steeves in a Suburban or Tahoe, I'm not sure which it was, that morning before the robbery. But that's it. He can't put anyone at the crime. He can't say he saw the crime. He just saw people in a car that morning. Hurst only testified of what he was allegedly told about after the crime had occurred. He had been a cooperating witness for the government for some time. It's stated in the record. He worked for the Secret Service. He worked for the FBI. He's a known snitch. He was impeached on the stand. It came out that he gave false investment of, excuse me, false information to investigators during the trial. And the appellants also believe that he's lying about the benefits that he received. Now, the suppressed calls had information pertinent to those benefits. The suppressed calls could potentially implicate giglio violations. He's already impeached. He's already not. Exactly, Your Honor. Cumulative. It's because if they already heard that he's not reliable, would the calls add that much more to it? Yes, Your Honor, it would. The case actually escapes me at the moment, but impeachment evidence doesn't become cumulative. When a witness for the government is being impeached, further impeachment evidence can further damage that case. And in a case like this one, where the government's other evidence, there is, Your Honor. The cumulative impeachment is actually helpful. Well, what it says, Your Honor, is that the individual can be further impeached, further damaging the government's case. And, again, the citation escapes me at the time, Your Honor. But Mr. Hurst sat on that witness stand and was impeached. And then the other evidence that was used against Mr. Estes and Mr. Brumfield, the court discussed six particular items that it said were significant in its analysis. It talked about a Tahoe that was stolen, reported stolen, with DNA of a little bear George in it. That has nothing to do with Mr. Estes or his co-defendant, Mr. Brumfield. It talked about cell phone data from Mr. George. Again, nothing to do with these two defendants. It talked about the fact that Mr. Brumfield and Mr. Estes called each other that morning. Well, they are cousins, so it is potential that they would call. And, frankly, the government's description of those phone calls puts the two sitting in the same car when the calls are being made. That doesn't make any sense. I've never called the individual sitting next to me in a car. It discusses a chase employee that contacted Mr. Estes and his father. Again, that's just information about a phone call that was made. It discusses cash at Mr. Estes' house, cash that Jamal Hurst couldn't properly identify. He couldn't properly identify the location of the house where the cash was found. He was two and a half miles wrong about where that house was. He couldn't identify the amount or the bills in denomination. Was that a drug deal in cash? It was, Your Honor. It came out in the record that Mr. Estes made that money from selling marijuana, and it was all low denominations, $2, $5, $10 bills, no hundreds, nothing that was taken from the Chase Bank. Finally, again, we're back to Cedric Wade giving the testimony about George being seen at his house in Otaho. If you take away Jamal Hurst's testimony completely, the government's case is definitely shaken, and there is a reasonable probability the result of the proceedings could have been different. What seemed to happen here is what the court did and what the government did in its brief is exactly what Justice Souter said we're not supposed to do. We're not supposed to do a sufficiency of the evidence test under Kyle's. The question, forgive me, Your Honor. What are we supposed to do under Kyle's? With Kyle's? Yes. What is the correct test? Well, the correct test is going back and determining whether there's a reasonable probability that we should trust the outcome of this trial. Now, when we look at what the jury had to do to come to a decision, they deliberated for nearly two days, and over that course of time, they sent back at least three questions to the judge. The first question, can somebody be guilty of one count and not guilty of others? The court answers in the affirmative, of course. Sometime later, they come back with their second question, what happens if we're unanimous as to one count, but we're not unanimous on the others? The court tells them you must come back with a unanimous verdict of either guilty or not guilty. After that, they come back with yet a third, and they said, well, we're unanimous as to all the counts on one defendant, but on the other defendant, we're not. And then we find out in the record that they're not unanimous on the most severe counts for Mr. Estive, the Hobbs Act robbery and the use of a firearm in commission of that Hobbs Act robbery. They were hung, essentially. They weren't able to come back with a decision until the judge prompted them, go back and get a unanimous verdict one way or the other. But you're not claiming that was wrong in any way? No, Your Honor. What I'm showing is there was already reasonable doubt in the jurors' minds, so there was already suspicion as to the confidence in this verdict. Okay. What do we do with the other evidence placing your client at the scene? Well, Your Honor, I see I'm out of time. Please answer that. Your Honor, the only other evidence placing my client anywhere near the scene that I can recall from the record were Chase Bank receipts, and I've never seen the bank give a receipt in a bank robbery. There's no other evidence that places Jeremy Estive at the scene. Okay. Thank you, Your Honor. Good morning, Your Honors. Diane Copes on behalf of the government, and with me are Kevin Hoytman and Brian McClaren, also of our Appeals Division. I would like to address two points. One is the minimization that Your Honor pointed out of all of the other evidence in order to increase Jamal Peirce's importance, and there was a lot of other evidence. And also that the defense is ignoring that there was a lot of impeachment that came out at trial. For example, at the time of trial, Jamal Hearst was being held in Baton Rouge Jail, the Baton Rouge Jail, for sexual battery of a six-year-old child and was hoping for help with that as he had received in the past. He said that on cross-examination. And so there was also indecent behavior with a juvenile, and he's hoping for help as he had received in the past. That's what he said on cross-examination. I would like to start with that. The idea that he got somewhat impeached, but he could have been much more impeached, does it matter? What case says that we wouldn't, that we could say, oh, it's cumulative, he would be impeached, they already didn't need to believe him because they knew a lot of bad things about him. But the government had its possession at some point, and I'm going to ask you about when did they know these things. So these other things, it could also have impeached him. And so is there a case that says it's just cumulative and it doesn't matter, or how do we weigh the fact that there were other things that he could have been impeached with that weren't turned over? Well, the test in Kiles v. Whitley is, look at whether the outcome of the case was affected, and as part of that you must necessarily weigh the evidence against the other evidence. I don't think that answers your question. There are issues as to, and if I'm not, Your Honor, would you repeat it? The question is, are you relying on some case that says that cumulative impeachment is a thing, and if it's cumulative impeachment, it doesn't matter if it didn't come in? Are you relying on that theory to hear today, and what case actually says that, that we should just ignore cumulative impeachment? United States v. Perry. That was out of our office, and I worked on this part of it. There was so much impeachment against the cooperating witnesses that this court found a letter later disclosed, written by one of these cooperating witnesses, saying that everything they said at trial was lies, was not material because they had already been impeached so thoroughly, and O'Keefe also says that when someone has been very thoroughly impeached to the point where additional impeachment would be cumulative, that's in the NAPU context, but the Perry case is particularly important because it was a very damning piece of evidence, the letter where the cooperating witness said not only was he lying, but the other two were as well, in a letter later disclosed to the government. So you think it is cumulative because Mr. Hurst was already thoroughly impeached, and so people were not going to believe a word he said? Well, Your Honor, may I address the other ways that he was impeached? Is that correct, though, that you believe that the jury wasn't going to believe Mr. Hurst anyway because he'd already been thoroughly impeached? Yes, and that's part of the materiality finding. So we throw out Mr. Hurst then because it doesn't matter because it's cumulative because he's already thoroughly impeached. Then we have to look at what else is left in the bucket without Mr. Hurst, and we can't rely on anything from Mr. Hurst at that point because we've relied on this cumulative theory. Isn't that right? Setting aside Mr. Hurst's testimony, the jury heard as to Brumfield that he went to Lydell Hinton and said the FBI was asking him questions about his role in the armed robbery and that they seemed to think that he was driving the second getaway car. He told, and he started out that way, but then Hinton asked him whether he really had something to do with the robbery for real, and he said he was in the car, that he was in the car. And he also said, yeah, I really got something to do with it. There were ten calls between the phones of Brumfield and Esteves on the morning of the robbery. One of them was at 10 a.m. from Esteves to Brumfield. It lasted 75 seconds, and after that, Esteves' phone went to voicemail during the robbery. But what happened in response to that call? This historical cell data shows that Mr. Brumfield traveled right after 10 from New Orleans East all the way to Uptown to the vicinity of the getaway car on Adams Street and Chase Bank. Mr. Sprinkle, on the other side, said if you put aside Mr. Hurst's testimony that the trial court identified half a dozen what it considered, if I got the quote right, significant pieces of evidence having, but he said they had nothing to do, nothing to do, he said, with these two defendants. So if I heard him right, the trial court said, putting aside the Hurst testimony, the trial court identified about half a dozen pieces of evidence, but he said that they really had no relevance to these two defendants. Well, Your Honor, I have the neutral order here, and he does specifically talk about the historical cell site evidence placing Brumfield at the scene and also the phone calls and that Chase insider, suspected Chase insider, Theory King, was involved with both Brumfield and Esteves to the extent that she had Brumfield's contact information in her phone and that Esteves was one of her top ten most frequent contacts. And Brumfield told Hinton that one of the guys involved had a girlfriend at the bank. Another important piece of evidence against Esteves was that he told Cedric Wade that they thought, he and the other guys, Brumfield was ratting them out, and you'll find that at page 3771. And also there is the significant testimony by Cedric Wade who had known Esteves all his life and put him in the driver's seat of a stolen Tahoe headed uptown in the direction of Chase Bank. And he was adamant, according to Special Agent Reyes, he was adamant that Esteves drove the Tahoe that morning. That's at 4561. When you put that together with the number of phone calls that happened between these two cousins on the morning of the robbery and the historical cell site showing Brumfield headed towards the robbery and Cedric Wade's testimony showing Esteves headed towards the robbery and with Brumfield headed towards Chase Bank and Adams Street, which is where the second getaway car was parked. So there, and Judge Affrey does refer to the historical cell site evidence. He refers to Theory King, and I'm looking at page 25 of his order, that she was a suspected bank insider and they found Esteves and Brumfield's numbers in her phone, and Esteves was one of the top ten most frequent numbers with which Ms. King had contact. He also talked about the historical cell site evidence. That's at page 26. He talked about Hinton testifying that Brumfield told him that he was in the car. And that's also at page 26. He talked about the shoeboxes, and I understand that this took place 2015. The search, and I'm referring to the search of Esteves' house. And just one point, the majority of the bills were $100 bills. Now, a couple of things that the jury heard. Were they tied to the bank robbery? No, because there were no, as the Loomis witness explained, there were no, they didn't track serial numbers for the Loomis deliveries. They just got the cash out of their cash reserve, and on order from Chase, provided the cash that Chase requested. So there was no way to trace them, and Judge Afric also noted that. But as Judge Afric pointed out, Cedric Wade's testimony was crucial about the conspiracy and the robbery and Esteves' role in it, and that's at page 24. Continuing on to page 25. So the contention that the district court did not consider individualized evidence against each of these defendants is not correct, and you can see that from his order. So, I hope I've answered your question. The money, I thought that Mr. Sprinkles said the money was from a marijuana sale. There was, Mr. Esteves put on witnesses, and they offered that theory, and the government offered that 2015 search that included $100 bills in the majority, and that's Agent Ray's testimony that it was, that the majority was hundreds at 448. But I thought he didn't have any hundreds. I'm sorry, Your Honor? Was I wrong? I thought that he said he didn't have hundreds and it was lower volume bills. Well. I'm sorry. So I thought that that was not the money that we're talking, the same money. Okay, this is from the search of Esteves' house, which was later. But the agent testified that it was not all in $100 bills, but the majority of it was, and that's at page 4482 of the record. Okay, so you think it's just a clash of credibility at that point? Well, yes, because the agent said the majority were $100 bills. However, Judge Afrey was very careful to ask and make clear to the jury that there was no way to actually trace those. So I consider those of lesser value than the other evidence against Esteves, such as Cedric Wade's extensive testimony about his knowledge of Esteves' growing up and how he was able to see in the Tahoe, and he was adamant. That was from the agent who interviewed him at 4561. He was adamant that Esteves drove the Tahoe and also that they headed off in the direction of uptown. So his testimony was also important for other ways, but right now I'm just focusing on specific evidence regarding Brumfield and Wade. However, Wade also testified he was very close with one of the shooters, Ofamata, and that when he arrived that morning with the other participants in the robbery in the stolen Tahoe, when he arrived that morning, he picked up a bag of guns, Ofamata did. He told Wade to watch the news because they were going to be on it, and that's a paraphrase. He said, we're going to get some money. Watch the news, we're going to get money. Yes, Your Honor, that's it. And so I have limited this specifically to evidence involving Mr. Brumfield and Mr. Esteves, but there was a lot more from Cedric Wade setting the scene that Ofamata picked up the guns. He told him he hoped that they wouldn't be late this time, which suggests that they were surveilling and maybe even rehearsing because he didn't want to be late. And there was also testimony just as to all the other conspirators and their roles, and there was testimony that together they were casing the bank. You see that through Crystal Moore, who became very nervous because three guys in the stolen Tahoe that was stolen that morning, three guys who she couldn't see that well, but she could see that all three were leaning forward, and she could see that one was older, two were younger. There was other evidence, and this is setting aside Hurst's testimony, that they saw Hector Trochez, and he was a big, fat, clumsy guy, and it was going to be an easy crime. So I'm setting that aside, too. I'm ignoring Hurst's testimony. But if you look at Cedric Wade and Lydell Hinton, along with the historical cell site information and the phone calls between them, the fact that they're on the contact list of a suspected bank insider, and Steve's was one of the top ten most frequent contacts of her. And again, they gave other reasons, but that was for the jury to decide. And Steve's— You're running out of time, I'm afraid. Oh. Do you have time to talk about the— I'm sorry. No, you didn't do anything wrong. About whether or not there's a due process violation that would independently justify a new trial with regard to failure to correct false testimony? As to NAPU, the first two were elicited on cross-examination. And as O'Keefe and Stanford say, that's not part of the government's presentation, so it's not considered NAPU, and I didn't cover that in my brief, and I apologize. But that's what the cases say. If something is elicited— Third about the FBI. I'm sorry, yeah? Third about the FBI. Failure to correct false testimony or rebuttal about whether the FBI was involved in Orleans Parish. The only information of any FBI involvement in Orleans Parish was the confidential informant case opening file, which, as you'll see in the supplemental sealed record, is much more limited than it was represented to be a trial. And it asked, is there an outstanding warrant? They were opening Hearst as a CI. Is there an outstanding warrant? Yes. Does the jurisdiction intend to extradite? No. And it shows Agent Elmer responding to those. And so there's no evidence of falsity. There is no evidence that the FBI was involved in the outcome of the aggravated burglary case out of New Orleans. In fact, I've searched the docketmaster for Orleans Parish, and I mean, I know this is me speaking outside the record, but I searched and I could not find any charges brought or other evidence that the DA had accepted the charges that there was prosecution was continuing. But there's— Is it your position that the AUSA didn't know about this, what was going on? Because I thought the AUSA was the person who actually negotiated the agreement on behalf of New Orleans Parish. That's not true. That's correct. If you look at the case opening form, and we supplemented with this. When I was writing this, we didn't have— Did not broker any deal with the New Orleans Parish DA? What the case opening form says, and this is the only evidence of non-extradition, is that this is the case agent's opening form. And he said, these are check boxes you check. And one of them was, you're wanting to use him as a CI. Have you notified the federal prosecuting agency? And he said, yes, Mike McMahon. And there was another question about whether the CI was the target of a pending investigation. And he said, yes, he had notified AUSA McMahon. And that's the whole of this agreement that they talk about throughout the trial. And it was supposed to be in the record. It was an exhibit that was going to be introduced by the defense, but it didn't make its way into the record, nor did I actually find it to supplement it until later. So I think I said in the brief, I'm not sure what it said until I found it, and then we supplemented the record with it. And I think if you read that, and that is the only evidence of FBI involvement with the aggravated burglary charge out of New Orleans. In fact, I think your time is up. Oh, thank you. Thank you very much. Thank you, Your Honors. I think a very relevant case site with regards to your questions about cumulative prejudice is Weary v. Cain. I'll quote from the decision there, where they reversed, where a prosecution witness whose credibility already impugned at trial by his many inconsistent stories would have been further diminished had the jury learned additional information to undermine his veracity. What court is that? It's the Supreme Court of the United States. And again, Weary v. Cain. So I think that it's extremely important when, you know, just because some impeachment evidence came in at trial, it does not mean that additional impeachment evidence can't be critically important. I think Perry also can be distinguished because the court in Perry talked about the overwhelming evidence of guilt, and that was why the additional impeachment evidence had less value. Also, you know, Liddell Hinton, I know, was discussed by the prosecution. And I think something's important to note. Unlike all the evidence that was not disclosed that pertained to Jamel Hurst, I believe that the reason why Liddell Hinton appears to have not been believed and that Mr. Brumfield was acquitted of the substantive charges is because it did come out at trial that Liddell Hinton was facing a life sentence on sex trafficking charges. And pursuant to his deal with the prosecution, his maximum sentence was reduced to five years. So he had extreme reason to testify in accordance with the prosecution's wishes. There also were severe problems with, you know, with the phone evidence. First, as detailed in the brief, there was a problem with the timeline. There was no time for this car to get to New Orleans East. And also, the only evidence presented at trial, the phone that is being presented as Robert Brumfield's phone had anything to do with him, was a statement that this was either his aunt's phone or his grandmother's phone. We don't really know whose. We don't have any evidence that was ever in Robert Brumfield's hands. So the jury—I say that my time is up—but the jury's acquittals were supported by evidence that severely undermined Liddell Hinton's testimony and very much limited the impact of the cell phone evidence. Thank you. We have your argument. Thank you. Your Honors, briefly, the government spent a considerable amount of time in its brief relitigating whether or not Mr. Ofemata was guilty, when this case is really about whether or not the court was proper in its decision of denying these parties a new trial. Evidence of Mr. Hurst saying that the Loomis guard was going to be the big, fat, clumsy guy is further evidence of the fact that he was either making this stuff up or told false information because that guard wasn't even supposed to be the individual who left the vehicle and went into the bank that day. Somebody else was on the schedule for that. And further, Your Honors, as the government brought up the fact that Mr. Hurst's Orleans Parish file seems to have disappeared from the clerk record, I too can tell you that the East Baton Rouge clerk file for the heinous charges of sex crimes against the juvenile and burglary and the other items that he was maintained under pretrial detention for no longer exists. A public record search in that clerk of courts record will show that there's nothing for Jamal Hurst around that time to be found at all. Do you think the Department of Justice took them? Well, Your Honor, I can't say who took them. I can simply say they're not there. And I practice in East Baton Rouge Parish regularly. And for a file to not appear anymore in the clerk's record is outstanding, to say the least. I can't understand where that went. And, again, the case that my co-counsel cited, Perry, did talk about the fact that there was overwhelming evidence. And that overwhelming evidence would have been enough to convict, even in light of additional cumulative impeachment evidence. But that's not the case here. There's not overwhelming evidence against Jeremy Estes. None at all, especially with regards to the second and third counts that he's convicted of. Your Honors, the suppressed items were favorable. And they amount to a Brady violation. And this court should send it back for a new trial. Thank you. We have your argument. We appreciate all the arguments today. And we note that Mr. Novod is court appointed. And we appreciate your service. Thank you. We stand in recess. Recess.